## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

SHAIA BECKWITH SIMMONS,

               Plaintiff,

     v.

WELLS FARGO BANK, N.A. and
WELLS FARGO & CO.,

               Defendants.

CASE NO:

**COMPLAINT**

Class Action

Jury Trial Demanded

## COMPLAINT

Plaintiff Shaia Beckwith Simmons ("Simmons"), by and through her attorneys, hereby files this Complaint against Defendants Wells Fargo Bank, N.A. and Wells Fargo & Co. (collectively "Wells Fargo" or the "Firm"), and states as follows:

## JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT

1.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. In addition, this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(d), as the amount in controversy exceeds $75,000, Plaintiff is a citizen of Florida, and Defendants are citizens of South Dakota, Delaware, and California.

2.     Venue is proper in the Northern District of Florida pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District. Venue is proper in the Tallahassee Division of the Northern District of Florida because a substantial part of the events or omissions giving rise to the claims occurred in the county of Gadsden.

## PARTIES

3.     Defendant Wells Fargo & Co. is a publicly-traded, global financial services firm and Fortune 500 corporation incorporated in Delaware and has its principal place of business in San Francisco, California. As of September 30, 2023, Wells Fargo has assets of approximately $1.9 trillion, loans of $942 billion, deposits of $1.3 trillion and stockholders' equity of $182 billion.[1] Wells Fargo provides a wide variety of financial products and services to its global and domestic clients, who include corporations, governments, financial institutions and individuals, including home mortgages. Wells Fargo claims to serve at least one out of three households in the United States.[2]

4.     Defendant Wells Fargo Bank, N.A. is a national banking association chartered in South Dakota with its principal place of business in San Francisco, California, and a subsidiary of Wells Fargo & Co.

---

[1] https://www.wellsfargo.com/assets/pdf/about/investor-relations/sec-filings/2023/third-quarter-10q.pdf
[2] https://newsroom.wf.com/English/news-releases/news-release-details/2021/Wells-Fargo-launches-Banking-Inclusion-Initiative-to-accelerate-unbanked-households-access-to-affordable-

5.      Plaintiff Shaia Beckwith Simmons is African American and a citizen and resident of Florida. As described below, Plaintiff Simmons obtained a home mortgage with Wells Fargo and was subjected to Wells Fargo's racially discriminatory policies and practices.

## FACTUAL ALLEGATIONS

6.      As stated above, Wells Fargo is one of the largest banks in the country and one of the top residential mortgage providers in the United States. Across the country, Wells Fargo applies mortgage origination, approvals, interest rate determinations, fees, costs, refinancing, underwriting, deferment, forbearance, default, loan steering, and foreclosure policies and practices that intentionally and disproportionately discriminate against and harm Black and/or African American home loan applicants and home mortgage borrowers. Simmons was injured by Wells Fargo's racially discriminatory residential mortgage and lending policies and practices.

7.      Wells Fargo has a long history of racial discrimination and maintains a corporate culture replete with harmful racial stereotypes and biased views about Black and/or African American customers.

---

transactional-accounts/default.aspx#:~:text=Wells%20Fargo%20%26%20Company%20(NYSE%3A,of%20banking%2C%20investment%20and%20mortgage

8. Wells Fargo discriminates against Black and/or African American customers throughout its lending process, from application—where Wells Fargo disproportionately denies credit to Black and/or African American applicants—to origination—where Wells Fargo disproportionately charges higher interest rates, imposes higher fees and costs, and offers worse terms to Black and/or African Americans compared to non-Black, non-African Americans—to refinancing— where Wells Fargo disproportionately denies Black and/or African Americans the opportunity to modify or lower their interest rates—and servicing—where Black and/or African American borrowers are subjected to additional racial discrimination.

9. Wells Fargo has faced a number of recent lawsuits and settlements challenging these practices and disparities. For example, in 2011, a jury found Wells Fargo guilty of systematically discriminating against minority home buyers by using a computer software for minority homeowners which resulted in them paying more for their home loans than white borrowers. *Opal Jones, et. al v. Wells Fargo Bank, N.A., et al.*, Case No. BC337821 (Los Angeles Superior Court) ($3.5 million verdict). Wells Fargo has also paid hundreds of millions of dollars to avoid litigating its discriminatory home lending practices. Indeed, Wells Fargo agreed to a settlement valued at over $440 million of a lawsuit challenging the Firm's redlining practices, resulting in a disproportionate number of foreclosures in

African American neighborhoods in Shelby County and the City of Memphis. *City of Memphis and Shelby County, et al. v. Wells Fargo Bank, N.A., et al.*, Case No. 2:09-CV-02857 (W.D. Tenn.). Wells Fargo also settled a lawsuit for $37 million led by the National Fair Housing Alliance alleging that Wells Fargo took better care of foreclosed properties that it owned in white neighborhoods than those in African American and Latino communities. *National Fair Housing Alliance, et al. v. Wells Fargo Bank N.A., et al.*, HUD Case No. 09-12-0708-8 (U.S. Department of Housing & Urban Development Office of Fair Housing & Equal Opportunity).

10.    Wells Fargo has also faced and settled numerous lawsuits challenging its "reverse redlining" practices of charging higher rates and imposing less favorable terms for minority home borrowers than for white home borrowers. For instance, in 2013, Wells Fargo paid $175 million to settle a lawsuit brought by the United States Department of Justice alleging that the Firm charged higher rates to its African American and Latino borrowers.  *United States v. Wells Fargo Bank, NA*, Case No. 1:12-cv-01150 (D.D.C.).

11.    In 2019, Wells Fargo paid $10 million to settle a similar claim brought by the City of Philadelphia. *City of Philadelphia v. Wells Fargo & Co., et al.*, No. 2:17-cv-02203-AB (E.D. Pa. 2019). Philadelphia alleged that Wells Fargo simply swapped the evil of redlining—refusing to lend to minority communities—for the similarly pernicious reverse redlining—lending to minority borrowers, but

saddling them with more expensive loans with worse terms than those extended to white borrowers. *City of Philadelphia v. Wells Fargo & Co., et al.*, No. 2:17-cv-02203-AB (E.D. Pa. 2019), Dkt. 1 (Complaint) ¶¶ 5–21. Philadelphia alleged that "since at least 2004 . . . Wells Fargo has systematically engaged in a continuous and unbroken discriminatory pattern and practice of issuing higher cost or more onerous mortgage loans to minority borrowers in Philadelphia when more favorable and less expensive loans were being offered to similarly situated non-minority borrowers." *Id.* ¶ 5 (E.D. Pa.). Philadelphia's statistical analysis revealed that African American borrowers were more than twice as likely to "receive a high-cost or high-risk loan" than a white borrower even when controlling for credit score. *Id.* ¶ 14. Indeed, the discrimination worsened as the credit score increased—especially creditworthy "African-Americans with FICO scores over 660 were 2.570 times more likely to receive a high-cost or high-risk loan from Wells Fargo as a white borrower." *Id.* The predictable result of Wells Fargo's foisting high-cost, high-risk loans on African Americans was an explosion of foreclosures in minority communities, where loans were "4.710 times more likely to result in foreclosure than is a loan in a predominantly white neighborhood." *Id.* ¶ 12. This precipitated what "many leading commentators describe[d] as the 'greatest loss of wealth for people of color in modern US history.'" *Id.* ¶ 18.

12.     Other cities and counties have sued Wells Fargo for its discriminatory home lending practices. The City of Baltimore filed a lawsuit against Wells Fargo under the Fair Housing Act, in the U.S. District Court for the District of Maryland, Baltimore Division. The plaintiffs, alleging that Wells Fargo had engaged in predatory and discriminatory lending practices that had led to foreclosures harming the city, asked the court for declaratory and injunctive relief and damages. City of Baltimore v. Wells Fargo Bank, N.A., Case No. 08-cv-00062 (D. Md.).

13.     The city of Miami brought a lawsuit under the Fair Housing Act against Wells Fargo. In its suit, Miami alleged that Wells Fargo Bank engaged in discriminatory lending practices and that, as a result of these practices, Miami suffered an appreciable loss of property tax revenue as well as an attendant increase in the costs of municipal services the city provided. These increased costs, the city alleged, were a result of Wells Fargo's discriminatory lending practices. City of Miami v. Wells Fargo Bank, N.A., Case No. 13-cv-24508 (S.D. Fla):

14.     The city of Los Angeles filed a suit asserting two claims for (1) violating the federal Fair Housing Act, and (2) common-law restitution. According to the City, Defendants engaged in discriminatory lending practices that resulted in a disparate number of foreclosures in minority areas of Los Angeles. Specifically, the City alleged that Defendants have engaged in "redlining" and "reverse

redlining." The City of L.A. v. Wells Fargo Bank, N.A., Case No. 13-cv-9007

(C.D. Cal.):

15.    Cook County filed a Fair Housing Act suit against Wells Fargo,

alleging that Wells Fargo engaged in discriminatory lending practices against

minority borrowers. Cook County alleged that Wells Fargo issued predatory

subprime mortgage loans to Cook County residents that over the years went into

default and drove the mortgaged properties into foreclosure. According to the

County, the scheme was and remains concentrated in heavily minority

neighborhoods. Cook Cnty. v. Wells Fargo Bank, N.A., Case No. 14-cv-9548

(N.D. Ill.).

16.    The City of Miami Gardens filed suit against Wells Fargo, alleging

that Wells Fargo violated the Fair Housing Act by steering Black and Hispanic

borrowers into highercost loans than similarly situated white borrowers. City of

Miami Gardens v. Wells Fargo Bank, N.A., Case No. 14-cv-22203 (S.D. Fla.):

17.    Wells Fargo found new avenues to discriminate against Black and/or

African American customers with changes to the home mortgage market.

Nationwide, homeowners had the opportunity to take advantage of historically low

interest rates through refinancing, which occurs when a homeowner applies for

credit related to their residential real estate to change the terms of an earlier loan.

Over the last two years, U.S. homeowners refinanced almost $5 trillion in

mortgages, generating untold savings. This could have been an opportunity for African American homeowners to build wealth and secure their families' futures. Wells Fargo, however, systematically and intentionally shut Black and/or African American customers out of this major wealth event. According to an analysis of 2020 Home Mortgage Disclosure Act data, Wells Fargo approved 33.7% of refinancing applications from Black and/or African American applicants, compared with 49.1% from white applicants. Wells Fargo denied Black and/or African Americans borrowers' applications outright 36.1% of the time, versus 20.3% of the time for white borrowers. These disparities are statistically significant at over 31 standard deviations.

18.    And just as it does with home purchase loans, Wells Fargo charges higher costs and interest rates to Black and/or African American customers who obtain refinancing. In 2020, Wells Fargo charged the average national Black and/or African American refinancing recipient 3.18% versus 3.11% for white refinancing recipients, and charged Black and/or African American customers an average of $5,335 in costs and fees versus $4,193 for white borrowers, for an average cost of borrowing of 2.6% for Black and/or African American customers versus 1.8% for white borrowers. All these disparities are statistically significant.

19.    Wells Fargo's failure to extend refinancing and other home loans to Black and/or African American customers has even drawn the attention of

members of Congress. Senators Elizabeth Warren and Ron Wyden recently wrote a letter to Wells Fargo's Chief Executive Officer Charles Scharf excoriating the Bank for its "shocking disparity" in its approval ratings of Black and/or African American refinancing applicants.[3] The Senators stated that Wells Fargo's recent actions were consistent with "Wells Fargo's long history of scamming and mistreating consumers of color."[4] Furthermore, the Senators believed "Wells Fargo's treatment of Black borrowers is deeply concerning, no matter how one looks at the data" and concluded, "Wells Fargo appears to be simply unable or unwilling to stop preying upon customers of color."[5]

20.     Just recently, the Consumer Financial Protection Bureau ("CFPB") issued a notice to Wells Fargo regarding problems with its use of mortgage rates discounts. In the CFPB's review it found "statistically significant disparities" in the rates in which Black borrowers got pricing exceptions compared with other customers.

21.     Wells Fargo engages in predatory lending practices to force Black and/or African American borrowers to accept less favorable terms and in rare instances where Black and/or African American receive favorable terms,

---

[3]Letter from Senators Elizabeth Warren and Ron Wyden, March 16, 2022 https://www.warren.senate.gov/imo/media/doc/2022.3.16%20Letter%20to%20Wells%20Fargo%20on%20Refinancing%20Discrimination.pdf
[4] *Id.*
[5] *Id.*

pressuring Black and/or African American borrowers to increase their rates by improperly treating Black and/or African American borrowers' loans in default and instituting improper foreclosures.

22.    Wells Fargo continued to pursue new discriminatory and predatory lending practice during the COVID-19 pandemic.

23.    The Coronavirus Aid, Relief, and Economic Security Act of 2020 (the "CARES Act") provided a variety of emergency financial relief due to the unprecedented economic interruptions of the pandemic, including a moratorium on foreclosures and requiring certain mortgage lenders to offer a forbearance program for those experiencing economic hardship. CARES Act § 4022(b).

24.    Under the CARES Act, certain federally-backed mortgage borrowers could obtain up to 360 days of forbearance of mortgage payments by requesting forbearance and "affirming that the borrower was experiencing a financial hardship during the COVID-19 emergency." CARES Act § 4022(b)(1)-(2).

25.    However, through its unscrupulous practices, Wells Fargo used CARES Act deferrals as a mechanism to extract wealth from Black homeowners, generating delinquencies and foreclosures by deliberately targeting Black homeowners for easy entry into forbearance but obfuscating the repayment requirements after the end of forbearance.

26.    Rather than eliminate the discrimination, Wells Fargo devoted

enormous resources to barring its own top executives, the public, and shareholders

from learning about the racial discrimination against its customers. For example,

Wells Fargo's internal reports routinely dismiss significant racially disparate

outcomes as "practically" not significant. It also hires outside law firms paid for by

Wells Fargo to conduct investigations or "audits" of serious discrimination

allegations only to deny them and to support a false public narrative that it remains

committed to inclusivity and its stated, but not practiced, policies of non-

discrimination.

27.    Wells Fargo discriminates against its African American employees

just as readily as it does its customers. In 2016, Wells Fargo was charged with

systemic discrimination against minority Financial Advisors including by African

American Financial Advisors in the class action lawsuit *Slaughter v. Wells Fargo

Advisors*, 14-cv-06368 (N.D Ill. 2014). Wells Fargo eventually settled the

*Slaughter* litigation for over $35 million. *Slaughter v. Wells Fargo Advisors*, 14-

cv-06368 (N.D Ill. 2014), Dkt. 99-1.

28.    On February 17, 2022, Christopher Williams filed a class-action

complaint challenging Wells Fargo's racially discriminatory lending practices.

(*Williams v. Wells Fargo, N.A.*, 22-cv-00990, Compl., Dkt. 1). After *Williams* was

filed, four other class action lawsuits were filed similarly challenging Wells

Fargo's discriminatory mortgage practices. *Braxton v. Wells Fargo Bank, N.A.*, 22-cv-01748 (N.D. Cal. 2022); *Pope v. Wells Fargo Bank, N.A.*, 22-cv-01793 (N.D. Cal. 2022); *Ebo v. Wells Fargo Bank, N.A.*, 22-cv-02535 (N.D. Cal. 2022); *Perkins v. Wells Fargo, N.A.*, 22-cv-03455 (N.D. Cal. 2022); *Thomas v. Wells Fargo & Co.*, No. 3:22-cv-01931-JD (S.D.N.Y. 2022).

29.    Counsel for *Williams* previously included Simmons' as a named putative class representative in an Amended Complaint on April 14, 2022, that included both her individual and class complaints, and which Wells Fargo Answered. (*Williams*, Dkts. 22, 50-51). The Court consolidated all five lawsuits against Wells Fargo, requiring a Consolidated Complaint to be filed, and appointed Interim Class Counsel for the consolidated matter. (*Williams,* Dkts. 75, 102, 111). Interim Class Counsel filed a consolidated class complaint which did not include Simmons as a Class Representative but included her allegations in the Amended Consolidated Complaint as a Class Member. (Dkt. 114).

30.    While Simmons believes her claims are tolled pursuant to the *American Pipe* Tolling doctrine, she files this complaint out of an abundance of caution because she has reason to believe the consolidated class action may not cover her individual claims related to Wells Fargo's racially discriminatory treatment.

## <u>PLAINTIFF WAS INJURED BY DEFENDANTS'</u>
## <u>DISCRIMINATORY POLICIES AND PRACTICES</u>

31.    Plaintiff Shaia Beckwith Simmons is a public relations expert, community advocate, motivational speaker, and a school principal, with a Bachelor's in Business Administration and Management and a Master's in Educational Leadership and Administration from Florida A&M University. She and her husband, a Division I football coach, are pillars of their local community.

32.    Simmons is a well-qualified African American home borrower who obtained a home mortgage loan in 2009 that Wells Fargo later purchased, and refinanced it with Wells Fargo for a lower interest rate in 2013.

33.    During the COVID-19 pandemic, as required by the CARES Act, Wells Fargo offered existing home mortgage borrowers the option to defer their payments.

34.    Wells Fargo solicited Simmons to seek forbearance by telephone, and because her family experienced a temporary reduction in income during the pandemic, Simmons accepted. Simmons's telephone conversation enrolled her in a three-month forbearance program.

35.    Simmons understood Wells Fargo's forbearance program to be a simple deferment, which allowed her to restructure her loan to tack payments she missed during the forbearance period on at the end of her loan. A Wells Fargo

representative repeatedly confirmed her understanding over the phone that she would make up for the missed payments at the end of her loan.

36.    Toward the end of her first three months of forbearance, Wells Fargo again initiated a call to Simmons asking whether she wished to extend forbearance, and she again agreed. Wells Fargo would repeat this process two more times, resulting in Simmons deferring 12 months of mortgage payments during forbearance.

37.    At the end of the forbearance period, Simmons promptly resumed making her mortgage payments in full, as she had done for many years.

38.    Contrary to its repeated assertions to Simmons, Wells Fargo immediately treated the deferred payments during the forbearance period as a delinquency, rather than deferring them.

39.    Yet consistent with its nationwide discriminatory practices and treatment, Wells Fargo maliciously instituted foreclosure proceedings against Simmons in February 2022, asserting that Simmons was in default for failure to make mortgage payments during her forbearance, and causing Simmons severe emotional distress.

40.    Consistent with its nationwide practices of predatory lending to extract wealth from Black and/or African American customers, Wells Fargo pressured Simmons to modify her loan, potentially at a higher interest rate that

would cost her many thousands of dollars over the remaining life of the loan, as her means to avoid the malicious foreclosure to take her home away from her and resell it in a booming market.

41.     Simmons declined to modify her loan and resisted the wrongful foreclosure until it was dismissed in August 2022.

42.     Though Simmons was eventually able to defer her forbearance payments to the end of the loan through a partial claim mortgage, she ended up owing more in fees and costs due to Wells Fargo's wrongful and discriminatory actions.

43.     Wells Fargo's unlawful actions have caused Simmons emotional distress and financial harm, in an amount to be proven at trial.

## COUNT I

## EQUAL CREDIT OPPORTUNITY ACT

44.     Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

45.     The Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*, makes it unlawful for a creditor to discriminate against any applicant with respect to any aspect of a credit transaction on the basis of race.

46.     As described above, Defendants are creditors because they regularly extend, renew, and continue credit, and Plaintiff was an applicant for credit.

47.    Defendants maintained a nationwide set of uniform, discriminatory mortgage loan origination, refinancing, and underwriting practices and engaged in a pattern or practice of systemic race discrimination against Black and/or African American mortgage loan applicants and borrowers that constitutes illegal intentional race discrimination in violation of the Equal Credit Opportunity Act.

48.    Plaintiff was subjected to and harmed by Defendant's systemic and individual discrimination.

49.    Defendants' unlawful conduct resulted in considerable harm to Plaintiff.

## COUNT II

### RACE DISCRIMINATION IN VIOLATION
### OF 42 U.S.C. § 1981

50.    Plaintiff realleges each and every paragraph above and incorporate them by reference as though fully stated herein.

51.    Under 42 U.S.C. § 1981, persons of all races are guaranteed the same right to make and enforce contracts, regardless of race. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

52.    Defendants maintained a nationwide set of uniform, discriminatory mortgage loan origination, refinancing, and underwriting practices and engaged in

a pattern or practice of systemic race discrimination against Black and/or African American mortgage loan applicants and borrowers that constitutes illegal intentional race discrimination in the making and modification of contracts in violation of 42 U.S.C. § 1981.

53.    Plaintiff was subjected to and harmed by Defendants' systemic and individual discrimination.

## COUNT III

## RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1982

54.    Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

55.    Under 42 U.S.C. § 1982, all citizens are guaranteed the same right to inherit, purchase, lease, sell, hold, and convey real and personal property, regardless of race.

56.    As set forth above, Defendants maintained a nationwide set of uniform, discriminatory mortgage loan origination, refinancing, and underwriting practices and engaged in a pattern or practice of systemic race discrimination against Black and/or African American mortgage loan applicants and borrowers that constitutes illegal intentional race discrimination and disparately impacts Black and/or African American applicants and borrowers in violation of 42 U.S.C. § 1982.

57.    Plaintiff was subjected to and harmed by Defendants' systemic and individual discrimination.

## COUNT IV

### RACE DISCRIMINATION IN VIOLATION OF THE FAIR HOUSING ACT OF 1968, 42 U.S.C § 3601 *et seq.*

58.    Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

59.    The Fair Housing Act, 42 U.S.C. § 3605(a), prohibits any entity whose business includes engaging in residential real estate-related transactions from discriminating against any person in making available such a transaction on the basis of race.

60.    Defendants' business includes engaging in residential real estate-related transactions.

61.    As set forth above, Defendants maintained a nationwide set of uniform, discriminatory mortgage servicing practices and engaged in a pattern or practice of systemic race discrimination against Black and/or African American borrowers that constitutes illegal intentional race discrimination and disparately impacts Black and/or African American mortgage borrowers in violation of the Fair Housing Act of 1968.

62.    Plaintiff was subjected to and harmed by Defendants' systemic and individual discrimination.

## COUNT V

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

63.     Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

64.     Defendants' actions directed toward Plaintiff were outrageous, beyond the bounds of decency, and odious and intolerable in a civilized community.

65.     By their actions directed toward Plaintiff, Defendants knew or should have known that emotional distress was likely to result.

66.     By their actions directed toward Plaintiff, Defendants recklessly or deliberately caused Plaintiff to suffer emotional distress.

67.     The emotional distress Defendants caused Plaintiff to suffer was severe.

## COUNT VI

## BREACH OF CONTRACT

68.     Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

69.     Plaintiff and Defendants entered into valid and enforceable oral and written contracts and agreements under which Defendants promised to place

Plaintiff's mortgage into temporary forbearance and to allow Plaintiff to defer making certain payments until after the end of the original loan period.

70.    Plaintiff performed under these contracts and agreements.

71.    Defendants materially breached these contracts and agreements by treating Plaintiff's deferred payments as delinquent and instituted foreclosure proceedings against her.

72.    Plaintiff was damaged by Defendants' breaches.

## COUNT VII

### PROMISSORY ESTOPPEL
### (Pleaded in the Alternative to Count VI)

73.    Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

74.    Defendants promised Plaintiff that her mortgage would be put into temporary forbearance whereby she would be allowed to defer making certain payments until after the end of the original loan term.

75.    Defendants reasonably expected or should have expected that Plaintiff would act in reliance on their promise by ceasing to make payments during the forbearance period.

76.    Plaintiff did in fact act in reliance on Defendants' promise by ceasing to make payments during the forbearance period.

77.    Injustice can be avoided only by enforcing Defendants' promise.

## COUNT IX

### FRAUDULENT INDUCEMENT

78.    Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

79.    Defendants falsely represented to Plaintiff that her mortgage would be put into temporary forbearance whereby she would be allowed to defer making certain payments until after the end of the original loan term.

80.    Defendants knew that the foregoing material representation was false and never intended to allow this deferral.

81.    Defendants intended that Plaintiff act on its material representation by ceasing to make payments during the forbearance period.

82.    Plaintiff ceased making payments during the forbearance period in reliance on Defendants' material representation.

83.    Defendants' material representation caused Plaintiff to suffer damages.

## COUNT X

### NEGLIGENT MISREPRESENTATION

84.    Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

85.    Defendants falsely represented to Plaintiff that her mortgage would be put into temporary forbearance whereby she would be allowed to defer making certain payments until after the end of the original loan term.

86.    Defendants made the foregoing material representation in the course of their business, profession, and employment, and in the course of a transaction in which they had pecuniary interests.

87.    Defendants made the foregoing material representation for the guidance of Plaintiff in her mortgage transactions with Defendants.

88.    Defendants failed to exercise reasonable care or competence in obtaining the information conveyed in this material representation or in communicating it to Plaintiff.

89.    Plaintiff justifiably relied on Defendants' material representation.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court find against Defendants as follows:

a.    Declare that Defendants' acts, conduct, policies and practices are unlawful and violate the Equal Credit Opportunity Act, 42 U.S.C. §§ 1981 and 1982, and the Fair Housing Act; and other state law claims;

b.    Declare that Wells Fargo engaged in a pattern and practice of racial discrimination against Black and/or African American applicants and

borrowers;

c.       Award Plaintiff compensatory and punitive damages;

d.       Award Plaintiff prejudgment interest and attorneys fees, costs and

disbursements, as provided by law;

e.       Award Plaintiff such other make whole equitable, injunctive and legal

relief as this Court deems just and proper to end the discrimination

and fairly compensate Plaintiff.

f.       Award Plaintiff such other relief as this Court deems just and proper.

## **DEMAND FOR A JURY TRIAL**

Plaintiff hereby demand a jury trial as provided by Rule 38(a) of the Federal

Rules of Civil Procedure and Civil Local Rule 3-6.

Respectfully submitted,

BEN CRUMP, PLLC

By:/s/ Natalie Jackson
Natalie Jackson, Esq. (FL Bar #0646075)
Sue-Ann Robinson, Esq. (FL Bar #29462)
121 S. Orange Ave., Ste 1500
Orlando, FL 32801
Tel: (800) 713-1222
court@bencrump.com
natalie@bencrump.com
sueann@bencrump.com

*Attorneys for Plaintiff*